IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

BARRY CARTER,                    )
                                 )
    Plaintiff,                   )
                                 )
                                 )
        v.                       )   1:15-cv-00572 (JCC/JFA)
                                 )
                                 )
OFFICER S. KHAN,                 )
                                 )
    Defendant.                   )

## M E M O R A N D U M   O P I N I O N

This matter came before the Court on Defendant Officer Sameer Khan's ("Khan") motion for summary judgment. [Dkt. 15.] Plaintiff Barry Carter ("Carter") filed this case against Khan for unlawful arrest and excessive use of force in violation of the United States Constitution and state law. [Dkt. 1.] This motion has been fully briefed and argued and is now ripe for disposition. For the following reasons, the Court will grant Defendant's motion for summary judgment.

### I.    Background

The following facts are taken from parties' Local Rule 56(B) statements and are undisputed[1] unless otherwise indicated. (*See* Def.'s Stmt. of Facts ("SOF") [Dkt. 16] at 2-12.)

---

[1]    For ease, undisputed facts are referred to by "SOF" without a party designation.

1

The allegations in Carter's complaint arise from the night of February 8, 2014, when Falls Church Police Officer Sameer Khan deployed his taser while arresting Carter for obstructing justice and resisting arrest.  The arrest began as a traffic stop, but escalated when Carter exited his vehicle and refused several commands to get back inside.  This confrontation was not Carter's first meeting with local police officers regarding his driving of this truck.  A brief look at Carter's history with traffic violations will help to frame the circumstances of Carter's arrest in February 2014.

About six months before the night of arrest, Officer Khan pulled behind Carter's beige 1989 Ford Ranger to inspect what appeared to be a non-functioning high-mount brake light.  (SOF ¶ 27.)  Khan soon learned that Carter was also driving on a suspended license.  (SOF ¶ 27.)  Before Khan could activate his police lights, Carter pulled into a Budget Inn motel parking lot and exited his truck.  (SOF ¶ 28.)  Khan pulled into the lot and ordered Carter to get back into the truck, but Carter refused and instead asked why he was being stopped.  (SOF ¶ 28.)  Khan explained about the suspended license and equipment violation, but Carter denied both allegations and did not get back in the truck until two other officers arrived.  (SOF ¶ 28; Khan Dep. at 99.)  Khan ultimately issued a summons for driving while

suspended, which was nolle prossed when Carter remedied his suspended license. (SOF ¶¶ 31-32.)

Two months later, and four months before the February arrest, Khan again stopped Carter for a defective high-mount brake light.  (SOF ¶ 33.)  This time, Carter remained in his vehicle throughout the stop.  (SOF ¶ 33.)  After Khan conducted some research on his cruiser's computer, he decided against issuing a summons for the high-mount brake light and instead cited Carter for his truck's lack of a muffler.  (SOF ¶ 34.) Carter failed to appear in court in response to this summons, causing his license to again become suspended.  (SOF ¶ 35.)

Another two months later, Fairfax County police stopped Carter in the same truck and cited him for driving on a suspended license, operating an uninspected vehicle, and not wearing a seat belt.  (SOF ¶ 36.)  Carter again failed to appear in court and was found guilty in absence.  (SOF ¶ 36.)

These three prior incidents lay the foundation for the events of February 8, 2014.  That night was scheduled to be Khan's last day as a Falls Church police officer before he transferred to a different police force.  (SOF ¶ 4.)  Khan "had pretty much stopped writing tickets for minor violations at that point" as he "didn't feel that it was necessary to write more tickets and have more reasons—more court dates to have to come back to when I was no longer employed by the agency."  (Khan

3

Dep. 119-20.)  But when he saw a beige Ford Ranger pass him without a functioning high-mount brake light, Khan decided to stop the truck to "let the motorist know that they had a defective equipment violation."  (Khan Dep. at 23.)  Khan followed the truck for only a few seconds before it pulled into the same Budget Inn where Carter and Khan met months earlier. (SOF ¶ 10.)  Khan stopped his cruiser about twenty feet behind the truck.  (SOF ¶ 11.)

Upon coming to a stop in the parking lot, Carter immediately exited his truck.  (SOF ¶ 11.)  Carter testified that he was not mad at this time, but he was "annoyed—very annoyed" and began to engage Khan in a verbal "back and forth" without leaving the side of his truck.  (Carter Dep. at 60, 63, 238.)  Carter described the incident as follows:

> [I] [g]ot out of the vehicle.  I asked him
> what he stopped me for.  He asked me to get
> back in my vehicle.  Well, at first he said
> the light.  He said the light.  And I asked
> him why would you stop me for the light,
> we've been through it before and the light
> doesn't count.  He asked me to get back in
> my vehicle.  So I asked him the question
> again.  And then I told him what he was
> doing was illegal.  He said what he was
> doing was not illegal.  At that point, he
> asked me to get back in my vehicle again.
> And I asked—I said the same thing to him
> again about stopping about the light.  We've
> been to court before.  Why are we still
> going through this with the light.  He
> ordered me to get back in the vehicle again.
> I asked him about the light one more time.
> And then I said fine, I'm calling Fairfax

> County Police.  I turned to get back into my
> vehicle.  I hear you're under arrest, pow.
> That's how it ended.

(*Id.* at 63-64.)  The "pow" Carter refers to was not a sound, but

instead was a five-second cycle of 50,000 volts at .03 amperage

from Khan's taser.  (SOF ¶ 19; Carter Dep. at 64.)  This shock

caused Carter to spin "a little bit" and fall to the ground in

the "general vicinity" of where he was standing when the taser

prongs struck him.  (Carter Dep. at 68.)  Photos from the scene

show Carter on the ground after the shock about five to ten feet

from his truck.  (Def.'s Ex. 26.)

In Khan's retelling of the circumstances of arrest,

Carter "exited the vehicle in an aggressive manner, yelling at

me with his fist balled," advanced toward the patrol car and

began to yell obscenities.  (Khan Dep. at 30-32.)  Khan says he

ordered Carter back into the truck two times before placing a

quick dispatch call for immediate backup.  (*Id.* at 37.)  He then

aimed his taser's laser sight at Carter's chest and told Carter

he was under arrest.  (*Id.* at 40, 118.)  Carter then turned back

toward his truck saying "you can't do hit [sic] shit to me."

(*Id.* at 38.)  As Carter walked toward the truck, Khan deployed

one five-second shock from his taser causing Carter to fall

immediately to the ground.  (*Id.* at 37-39.)

The only other witness was Carter's surrogate daughter

Ashley Good, who was in the passenger seat of the truck

throughout this event.  According to Good, Carter did not appear angry and his tone of voice was regular, but she "could tell he was frustrated from how he was saying what he was saying." (Good Dep. at 29.)  And although she did not see Carter do anything aggressive, she could sense frustration or tenseness from his "body language."  (*Id.*)

There are no objective recordings of these encounters. Khan's car-mounted camera had not been functioning for several months at the time of the arrest.  (Khan Dep. at 15.)  There are a few brief recordings of Khan's calls to police dispatch.  (*See* Def.'s Ex. 1.)  One of those calls recorded a loud, indistinguishable voice in the background, which Khan argues is Carter yelling.  (*See Id.* at File 232428; Decl. of Lt. Carter ¶ 2 (identifying this voice as Carter yelling).)  That brief recording, however, is uninformative of the tone or substance of Carter's "words back and forth" with Khan.

About thirty seconds after Khan deployed his taser, officers arrived in response to Khan's radio request for help. (Khan Dep. at 55.)  The first officer on the scene, Officer Issaev, quickly handcuffed Carter, who was still on the ground. (SOF ¶ 21.)  Emergency medical services were then dispatched to remove the taser prong, as Falls Church protocol does not permit officers to remove them.  (SOF ¶ 22.)  Khan allowed Carter to remain lying in the parking lot handcuffed during this wait

because he was concerned moving Carter might cause injury, in light of Carter's fall to the pavement. (SOF ¶ 22.) An ambulance arrived shortly before midnight and cleared Carter medically and removed the taser prong from Carter's lower back. (SOF ¶ 24.) Later, Khan brought Carter before a magistrate judge, who found probable cause to issue warrants for Carter's resisting arrest and obstructing justice. (SOF ¶ 26.) Carter was also cited for lack of a valid inspection and a cracked windshield. (SOF ¶ 26.) All of these charges were nolle prossed. (*See* Def.'s Ex. 5-8.)

Although Carter's claims in this case relate only to the events of February 8, 2014, his driving problems continued after that night. In March 2014, Fairfax County police cited Carter for operating an uninspected vehicle and he was found guilty in absence. (SOF ¶ 37.) In November 2014, Carter's lack of vehicle inspection resulted in another Fairfax County summons. (SOF ¶ 38.) Finally in January 2015, Fairfax County issued Carter a summons for invalid inspection and he was found guilty in absence. (SOF ¶ 39.) At the time of Carter's deposition in August 2015, his truck still had not passed inspection. (Carter Dep. at 106.)

Carter filed suit in Fairfax County on April 2, 2015, alleging unreasonable seizure and excessive force in violation of the U.S. Constitution, in addition to state law claims for

false arrest and false imprisonment, excessive force, malicious prosecution, and intentional infliction of emotional distress. On April 30, 2015, Khan removed the case to this Court and later moved for summary judgment.

## II.  Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex,* 477 U.S. at 323.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  The substantive law defines which facts are material.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  Therefore, "the non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'"  *Hughes v. Bedsole,* 48

8

F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson*, 477 U.S. at 256).

A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  Thus, when reviewing the record on summary judgment, the court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III. Analysis

**A.      42 U.S.C. § 1983**

Carter brought his federal claims for unreasonable seizure and excessive use of force under 42 U.S.C. § 1983, which "permits suit by a citizen who has been deprived of a right secured by the Constitution by a person acting under color of state law." *Bonner v. Anderson*, 81 F.3d 472, 474 (4th Cir. 1996).  Khan asserts that he is entitled to qualified immunity on Carter's federal claims.  (Def.'s Mem. in Supp. at 13-26.)

Qualified immunity protects government officials performing discretionary functions from liability, provided that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In light of those interests, qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations omitted). In other words, qualified immunity gives "government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Hagans v. Franklin Cnty. Sherriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012).

There are two steps in the qualified immunity analysis. Step one is to determine if the plaintiff has shown a violation of a constitutional right. Step two is to determine if that right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. The

10

answer to this second step depends on whether "it would be clear to an objectively reasonable officer that his conduct violated [the] right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). Courts can exercise their sound discretion when deciding which of the two steps to address first. *Pearson*, 555 U.S. at 236.

The Supreme Court has emphasized that "[b]ecause qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Furthermore, a "driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)) (internal quotations omitted). Therefore, qualified immunity should be addressed at the earliest possible stage of litigation, ordinarily at summary judgment. *Id*.

Applying those principles to this case, the Court finds that qualified immunity protects Khan from both the unlawful arrest and excessive force claim. The Court will first address the unlawful arrest claim.

1.        Unlawful Arrest

Applying the first step in the qualified immunity analysis, the Court concludes that Carter's arrest did not violate the U.S. Constitution.  The Fourth Amendment protects against unreasonable seizures, including unreasonable seizures of a person.  *California v. Hodari D.*, 499 U.S. 621, 624 (1991). It is well-settled, however, that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  States cannot change this federal constitutional standard by prohibiting arrests for minor offenses.  *Virginia v. Moore*, 553 U.S. 164, 176 (2008).

Probable cause to arrest exists when "facts and circumstances within the officer's knowledge . . . sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committed, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  A finding of probable cause "must be supported by more than a mere suspicion, but evidence to convict is not required."  *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (citing *Wong Sung v. United States*, 371 U.S. 471, 479 (1963)).  Therefore, the relevant

question for this Court is "whether a reasonable police officer could have believed" that probable cause existed to arrest Carter on February 8, 2014. *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001). This analysis turns on the following two factors: "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992).

When considering whether probable cause exists, the court is not limited to the officer's stated reasons for arrest. As the Supreme Court has made clear, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). In other words, an officer's "initial reason for making the arrest need not be the criminal offense that ultimately is supported by probable cause from the known facts." *Ware v. James City Cnty., Va.*, 652 F. Supp. 2d 693, 706 (E.D. Va. 2009). With these principles in mind, and viewing the facts in the light most favorable to Carter, the Court finds Khan had at least two bases to arrest Carter.

i.    *Equipment Violation*

Khan had probable cause to arrest Carter for defective equipment in violation of Virginia Code § 46.2-1014.1. This statute requires "every Virginia-registered passenger car

manufactured for the 1986 or subsequent model year" to be equipped with a "supplemental center high mount stop light" to be "actuated only in conjunction with the vehicle's brake lights and hazard lights."  A "passenger car" is "every motor vehicle other than a motorcycle or autocycle designed and used primarily for the transportation of no more than 10 persons, including the driver."  Va. Code Ann. § 46.2-100.  Based on the information Khan knew at the time, it was reasonable under the Fourth Amendment to arrest Carter for violating this statute.

When Khan saw Carter's truck, he immediately noticed the lack of a high-mount brake light.  Photos from the scene of the arrest show a cab covering Carter's truck bed.  (*See* Def.'s Mem. in Supp. Ex. 26.)  From these photos, it is clear that Carter's truck did not have a visible high-mount brake light, just as Khan observed and Carter admits.  (Carter Dep. at 121.) Furthermore, Carter's truck is a 1989 model, which is within the model-year bound by the high-mount brake light statute.

Carter argues that his truck does not need to comply with § 46.02-1014.1 because he primarily uses it to transport tools and work equipment.  Carter, however, cites no legal authority or facts to support this claim.  Even if it were true that his truck is exempt, something this Court does not conclude, "an arrest, though warrantless, is valid where the officer had probable cause to believe that a misdemeanor was

14

committed in his presence, even though the action he observed did not *in fact* constitute a misdemeanor." *DeChene v. Smallwood*, 311 S.E.2d 749, 750 (Va. 1984) (quoting *Yeatts v. Minton*, 177 S.E.2d 646, 648 (Va. 1970)).  It was certainly reasonable for Khan to conclude that the truck qualifies as a passenger vehicle, given that it has no commercial markings, was being driven during non-business hours, and Carter was actually transporting a passenger that night.  Therefore, Khan had probable cause to believe Carter violated Virginia Code § 46.2-104.1 in Khan's presence, which is sufficient to permit arrest under the Fourth Amendment.

> ii.        *Obstruction of Justice*

Khan also had probable cause to arrest Carter for violating Virginia Code § 18.2-460(A)'s prohibition against obstructing justice.  That provision imposes a Class 1 misdemeanor when "any person without just cause knowingly obstructs . . . any law enforcement officer . . . in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so." Va. Code Ann. § 18.2-460(A).  The question for the court is whether, the facts and circumstances "warranted a *reasonable* belief that [the arrestee] was, or was on the verge of, unlawfully obstructing [the officer] in the performance of his duties." *Coffey v. Morris*, 401 F. Supp. 2d 542, 547 (W.D. Va.

15

2005) (quoting *Wilson v. Kittoe*, 337 F.3d 392, 398-99 (4th Cir. 2003)).  To answer this question, we consider the "contours of the offense" under Virginia law.  *Rogers*, 249 F.3d at 291.

The Fourth Circuit has interpreted Virginia law as drawing a distinction between conduct that "merely impedes or frustrates the officer, which does not ground liability under the Obstruction Statute, and conduct that intentionally thwarts or prevents an arrest, which does."  *Kittoe*, 337 F.3d at 400 (citing *Rogers*, 249 F.3d at 291)).  Courts applying this standard to traffic stops further illuminate the dividing line between obstructing justice and merely frustrating an officer.[2] In *Coffey v. Morris*, for example, the district court found probable cause of obstruction of justice when a passenger exited a stopped vehicle after the officer ordered both passenger and driver to remain inside the car.  401 F. Supp. 2d 542, 547 (W.D.

---

[2]     Carter cites the case of *Jordan v. Commonwealth*, 643 S.E.2d 166, 168 (Va. 2007), to support his argument that merely rendering an officer's task more difficult or being less than cooperative is not obstructing justice.  (*See* Pl.'s Mem. in Opp'n at 7.)  *Jordan*'s discussion of Virginia law informed this Court's analysis, but its holding does not control the outcome of this case for several reasons.  First, *Jordan* involved obstruction of justice under § 18.2-460(C), which is a Class 5 felony requiring proof of obstructing justice through "threats of bodily harm or force."  Obstructing justice under § 18.2-460(C) is far more serious than the Class 1 misdemeanor involved in this case under § 18.2-460(A).  Second, *Jordan* considered whether there was sufficient evidence to sustain a *conviction* of obstruction of justice.  643 S.E.2d at 642.  This Court's inquiry, however, is only whether there was probable cause to believe obstruction of justice occurred, not whether a conviction could be sustained.

16

Va. 2005). The officer then tried to grab the passenger's arm to arrest her and the passenger resisted. *Id.* After concluding that the officer's order to remain in the car was lawful, the court found probable cause that the passenger obstructed justice by disobeying the order and exiting the car. *Id.* at 546. Therefore, the officer was entitled to qualified immunity on the § 1983 claim for unlawful arrest. Similarly, in *Durney v. Doss*, the Fourth Circuit found probable cause to arrest a driver who refused to comply with an officer's request for identifying information, returned to her vehicle without providing the information, and started her ignition. 106 F. App'x 166, 170 (4th Cir. 2004). Additionally, in *Ware v. James City County,* probable cause existed when a suspect refused to speak to an officer, stepped toward the officer aggressively, and pointed his finger in the officer's face. 652 F. Supp. 2d 693, 708 (E.D. Va. 2009). These cases demonstrate that Khan had probable cause to believe Carter had or was on the verge of obstructing justice.

By immediately exiting his vehicle, Carter interfered with Khan's ability to safely mark out his position on the radio or run Carter's license plate number. Furthermore, in Carter's own testimony, he admits to refusing several commands to return to his truck. While outside, Carter challenged Khan's basis for pulling him over and insisted that Khan had no right to stop

him.  Even Carter's eventual turn toward his truck at the end of
the encounter was in defiance, as Carter stated he was going to
call Fairfax County police on Khan.  These actions bring
Carter's conduct within the realm of cases cited above.
Therefore, Khan's arrest was reasonable under the Fourth
Amendment and cannot form the basis of a § 1983 action.

> ### iii.            *Resisting Arrest*

Having found that probable cause existed as to at
least two independent misdemeanors, the Court need not consider
whether there was also probable cause to arrest for resisting
arrest.  *See Ware*, 652 F. Supp. 2d at 709 (declining to consider
alternative theories of probable cause after concluding that
probable cause to arrest existed as to one crime).

In conclusion, viewing the facts in the light most
favorable to Carter, no reasonable juror could find a Fourth
Amendment violation for unreasonable arrest.  The Court will now
turn to Carter's claim of excessive use of force.

## 2.       Excessive Use of Force

Carter argues that Khan's use of a taser during the
arrest was excessive force in violation of the Fourth Amendment.
After considering parties' memoranda and oral argument, the
Court concludes that Khan's use of force was not unreasonable
and did not violate any clearly established law.  Thus,
qualified immunity protects Khan from liability for this claim.

i.        *Fourth Amendment*

The Fourth Amendment "bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2005) (quoting *Graham*, 490 U.S. at 395).  To prove excessive force, the plaintiff must show "that the officer's use of force to achieve arrest was objectively unreasonable under the circumstances." *Miller v. Parrish*, No. 3:12cv873, 2013 WL 1868028, at *7 (E.D. Va. May 2, 2013) (citing *Graham*, 490 U.S. at 395).  The objective reasonableness standard is highly fact dependent and requires the court to consider the totality of the circumstances "judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Gray v. Bd. of Cnty. Com'r of Frederick Cnty.*, 551 F. App'x 666, 672-73 (4th Cir. 2014).  In particular, courts should consider "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Meyers v. Balt. Cnty., Md.*, 713 F.3d 723, 732-33 (4th Cir. 2013) (quoting *Graham*, 490 U.S. at 396)).  Additionally, "the extent of the plaintiff's injury is also a relevant consideration." *Jones*, 325 F.3d at 527.  Courts must consider "the salient events 'in full context, with an eye toward the proportionality of the force in light of all the circumstances.'" *Parker v. Loren*, No.

1:13cv927, 2015 WL 3767555, at *4 (E.D. Va. June 16, 2015)

(quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)).

Applying those factors and viewing the evidence in the
light most favorable to Carter, the Court finds that Khan's use
of force was objectively reasonable.  The facts establish that
Khan had probable cause to believe Carter committed a minor
traffic violation and obstructed justice.  This routine traffic
stop escalated as a result of Carter immediately exiting his
vehicle, questioning and challenging Khan's authority, and
refusing several verbal commands to get back inside his truck.
Carter describes his attitude during this encounter as "annoyed—
very annoyed" and his daughter described his demeanor as
frustrated and tense.  During this verbal exchange, Khan did not
believe there was "any threat of deadly force to me or anyone
else."  (Khan Dep. at 39.)  But when Carter turned toward his
open truck, Khan reasonably feared that Carter might retrieve a
weapon or flee the scene.  This fear was supported by Carter's
continued challenges of Khan's authority, even when turning
toward the truck.  Furthermore, these events occurred rapidly
and in the darkness of near midnight.  From these circumstances,
Khan "faced an uncertain situation with the potential to evolve
into something more threatening, and acted in response."
*Parker*, 2015 WL 3767555, at *5 (finding two uses of taser,

including twenty-five-second shock, reasonable).  That response
was not disproportionate.

        If Khan was to deploy any force at all, a single five-
second shock from his taser was the least amount of force
reasonably available.  Falls Church police policy describes the
"typical escalation of force pattern" as "officer presence,
verbal commands, physical force, chemical munitions, electronic
control device (ECD), baton, less lethal (kinetic energy)
munitions, firearm."  (Def.'s Mem. in Supp. Ex. 31.)  Khan's use
of force complied with this policy.[3]  When Khan deployed his
taser, verbal commands had proven insufficient to control
Carter.  Furthermore, Carter was too far from Khan for the
effective use of physical restraints or pepper spray.  Thus, the
lowest degree of force available was an electronic control
device, or taser.  And although a taser is "more than a non-
serious or trivial use of force," *Thomas v. Holly*, 533 F. App'x
208, 217 (4th Cir. 2013), the taser in this case caused no
injury other than the initial shock and a minor puncture wound
to Carter's lower back.

---

[3]        A recent study found that the use of a taser "is
associated with overall decreases in suspect and officer
injuries when deployed with appropriate agency policies" and the
"relative risk of [taser] deployments appears to be lower than
other use-of-force options."  John H. Laub, Director, Nat'l
Inst. of Justice, *Study of Deaths Following Electro Muscular
Disruption* 3 (2011), *available at*
www.ncjrs.gov/pdffiles1/nij/233432.pdf.

In conclusion, the circumstances viewed in the light most favorable to Carter demonstrate that some use of force was justified and the force employed was reasonable.  Therefore, the Court grants Khan's motion for summary judgment on the § 1983 claim for excessive force.

       ii.          <u>*Clearly Established Law*</u>

Even if Khan's use of force was not reasonable, Khan would none-the-less be entitled to qualified immunity because his actions did not violate clearly established law.  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  To determine what a reasonable officer would understand, the court focuses "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged."  *Jackson v. Long*, 102 F.3d 722, 728 (4th Cir. 1996).  Looking at the contours of the law governing the use of a taser against an unsubdued and confrontational suspect, the Court cannot say that a reasonable officer would have understood the five-second use of a taser to be illegal in this case.

The Fourth Circuit has provided only limited guidance on the Fourth Amendment's limitations on taser usage.  *See Russell v. Wright*, 916 F. Supp. 2d 629, 638 (W.D. Va. 2013)

("The Supreme Court of the United States has not issued a decision substantively evaluating the use of tasers in an excessive force claim, nor does the law of this circuit offer many helpful examples."); Ian A. Mance, Comment, *Power Down: Tasers, The Fourth Amendment, and Police Accountability in the Fourth Circuit*, 91 N.C. L. Rev. 606, 616 (2013) (concluding from a review of cases that "the Fourth Circuit has yet to meaningfully consider a claim of excessive force by taser under the Fourth Amendment").  The primary guidance on taser use-of-force in the Fourth Amendment context comes from *Meyers v. Baltimore County*, 713 F.3d 723, 734 (4th Cir. 2013).  The officers in *Meyers* used a taser on a suspect three times in prong-mode, followed by seven additional stun-mode uses after the suspect had been disarmed of his baseball bat and restrained by three officers.  *Id.* at 727-29.  The Fourth Circuit agreed with the district court that the first three prong-mode uses were reasonable, but the following seven uses were excessive.  *Id.* at 733-34.  The Fourth Circuit stated affirmatively that "[i]t is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest."  *Id.* at 734; *see also Orem v. Rephann*, 523 F.3d 442, 447-49 (4th Cir.

23

2008) (finding Due Process Clause violation from taser use that was intended to "punish or intimidate" and was "wanton, sadistic, and not a good faith effort to restore discipline" of a woman detained in a police car). *Meyers*, however, was an extreme case of taser misuse and provides limited guidance for less clear-cut cases involving unsubdued and noncompliant suspects, like Carter.

Furthermore, there is no "consensus of cases from other circuits" that would have put Carter "on notice that his conduct is unconstitutional." *See Altman v. City of High Point, N.C.*, 330 F.3d 194, 210 (4th Cir. 2003) (looking at other circuits' case law). The Court of Appeals for the Eight Circuit has stated that it "is clearly established that force is least justified against nonviolent misdemeants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (denying qualified immunity for taser use on a woman passenger not resisting arrest or attempting to flee but not complying with order to get off her cell phone); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666-67 (10th Cir. 2010) (finding it excessive to use taser on woman suspected of domestic violence who merely walked into her house before officer gave any verbal command, warning, or announced the reason for his presence).

24

Correspondingly, the Sixth Circuit has stated the following rule based on an arrestee's active resistance: "If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012).  Other courts appear to follow a similar active-resistance standard.  *See, e.g.*, *McKenny v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (finding no excessive force when tasing unrestrained suspect who attempted to escape arrest through an open window even though suspect died as a result); *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (finding it reasonable to use taser on aggressive motorist who refused to comply with multiple verbal commands to produce documents).

A recent district court case applying the foregoing standards supports the conclusion that Khan did not violate clearly established law.  In *Russell v. Wright*, two officers stopped a vehicle driven by a man suspected of domestic violence.  916 F. Supp. 2d 629 (W.D. Va. 2013).  The suspect immediately exited his vehicle and walked toward the officers' cars with his hands on his head.  *Id.* at 633.  One officer shouted for the suspect to "get down—get down on the ground." *Id.*  Instead of following this command, the suspect remained standing and dropped his hands to his side.  *Id.*  As a result, one officer deployed his taser into the suspect's chest.  *Id.* at

25

634.  The whole incident was over in about seventeen seconds.
*Id.*  As a result of the shock, the suspect went into cardiac
arrest and ultimately died.   *Id.*   After conducting an extensive
review of the existing law, the district court concluded that it
"simply cannot say that [the officer's] use of his taser under
these circumstances violated clearly established law."  *Id.*   The
facts and outcome of *Russell* support a similar conclusion in
this case.

Even viewing the facts in the light most favorable to
Carter, his actions are more analogous to the active resistance
and threat of danger in *McKenny*, *Draper*, and *Russell*, than to
the above-cited cases finding excessive taser usage.  Carter
admittedly refused at least two orders to return to his truck,
during which time he describes his demeanor as "very annoyed."
Furthermore, even by Carter's daughter's account, his body
language was tense and he was frustrated.  When Carter did move
to return to his truck, he remained defiant of Khan's authority
to stop him, which reasonably indicated a threat of flight or
risk escalation.  Carter's memorandum in opposition to summary
judgment cited no cases that have found the use of a single
taser jolt in such circumstances to be an unreasonable
application of force, let alone clearly established law.  The
*Russell* court's opinion, however, strongly indicates that no
such clearly established law exists for this case.  This Court's

survey of the law confirms that conclusion.  Therefore, the Court finds that Khan is entitled to qualified immunity and grants his motion for summary judgment on this § 1983 claim of excessive use of force.

**B.       State Law Claims**[4]

In addition to the federal claims, Carter asserted several state law claims arising from the February 8, 2014 incident and arrest.  Specifically, Carter alleges (1) False Arrest and False Imprisonment (Compl. ¶¶ 26-30); (2) Excessive Force (*id.* ¶¶ 32-36); (3) Malicious Prosecution (*id.* ¶¶ 37-40); and (4) Intentional Infliction of Emotional Distress (*id.* ¶¶ 41-43).  Khan argues that he is immune under Virginia law from any state law claims and that he has not violated state law.  (*See* Def.'s Mem. in Supp. at 26-27.)  The Court will consider these arguments in turn.

1.       Sovereign Immunity

At the outset, the Court rejects Khan's argument that sovereign immunity protects him from liability for these alleged intentional torts.  The Court acknowledges that the application

---

[4]      As a threshold matter, having decided the federal claims in favor of Carter, the Court must determine whether to exercise its discretion to address these state law claims. Because the state law claims have been briefed by both parties and are without merit, "the balance between judicial efficiency and comity is struck in favor of the federal court's disposition of the state claims."  *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994).

of sovereign immunity in civil suits against officers is convoluted.  In Virginia, a government agent performing discretionary functions is protected from liability for ordinary negligence, but may be liable for acts of gross negligence.  *See Colby v. Boyden*, 241 Va. 125, 128 (Va. 1991) ("[T]he degree of negligence which must be shown to impose liability is elevated from simple to gross negligence.").  Some courts have applied this gross-negligence standard even in the context of intentional torts, such as assault and battery.  *See, e.g.*, *Ware v. James City Cnty., Va.*, 652 F. Supp. 2d 693, 712 (E.D. Va. 2009) (applying immunity to intentional tort claims); *Veney v. Ojeda*, 321 F. Supp. 2d 733, 747 (E.D. Va. 2004) (considering, but not finding, immunity for assault and battery).

This Court believes it is more consistent with Virginia law to not consider sovereign immunity in the context of these intentional torts.  In *Elder v. Holland*, the Virginia Supreme Court stated that "we must conclude that a State employee may be held liable for intentional torts."  155 S.E.2d 369, 372 (Va. 1967).  Furthermore, when discussing the loss of immunity through gross negligence, the Fourth Circuit has stated that an officer "obviously could not avail himself of the defense [of sovereign immunity] had he intended to commit an assault and battery."  *McLenagan*, 27 F.3d at 1008 n.10.  Many district courts interpreting Virginia law have declined to apply

28

sovereign immunity to the torts Carter alleges in this case. *See, e.g.*, *Hales v. City of Newport News*, No. 4:11cv28, 2011 WL 4621182, at *5-8 (E.D. Va. Sept. 30, 2011) (considering sovereign immunity for negligence claim, but not for intentional torts); *Harrison v. William Cnty. Police Dept.*, 640 F. Supp. 2d 688, 712 (E.D. Va. 2009) ("Sovereign immunity, however, does not extend to state employees who commit intentional torts.  Thus, the state law claims for the intentional tort of assault and battery . . . cannot be dismissed on sovereign immunity grounds." (internal citations omitted)); *Cominelli v. The Rector & Visitors of the Univ. of Va.*, 589 F. Supp. 2d 706, 716 (W.D. Va. 2008) ("[S]tate employees are not immune for wanton or grossly negligent behavior, intentional torts, or actions taken outside the scope of their employment.").  Therefore, the Court will not apply sovereign immunity to these alleged intentional torts.  The Court turns now to the merits of Carter's claims.

2.      False Arrest and False Imprisonment

        Carter has asserted a false arrest and false imprisonment claim against Khan.  "False imprisonment is the restraint of one's liberty without any sufficient legal excuse." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011).  If an arrest is lawful, "the plaintiff cannot prevail on a claim of false imprisonment." *Id.*  In Virginia, a uniformed officer generally "may arrest, without a warrant, any person who commits any crime

in the presence of the officer."  Va. Code Ann. § 19.2-81.  But, in the case of Class 1 or 2 misdemeanors, Virginia statute limits the officer to issuing a summons unless certain statutory exceptions permit arrest.  Va. Code Ann. § 19.2-74(A)(1). Obstruction of justice under Virginia Code § 18.2-460(A) is a Class 1 misdemeanor, thus an arrest is only lawful for this offense if one of the statutory exceptions is present.  *See Spiers v. Sydnor*, 3 F. App'x 176, 180 (4th Cir. 2001) (finding that even if probable cause of obstruction of justice existed "and therefore that he had the right to issue Spiers a summons, that offense did not give Sheriff Sydnor the right to make the equivalent of a custodial arrest").

The exceptions permitting an arrest pursuant to the observation of a Class 1 misdemeanor include "if any such person shall fail or refuse to discontinue the unlawful act" or "if any person is believed by the arresting officer to be likely to disregard the summons issued" or "to be likely to cause harm to himself or any other person."  Va. Code Ann. § 19.2-74(A)(1). "[T]he standard for determining satisfaction of the statute is objective, whether evidence supports a reasonable belief that the statutory circumstances obtain."  *United States v. Hudson*, 497 F. Supp. 2d 771, 774 (W.D. Va. 2007) (quoting *West v. Commonwealth*, 549 S.E.2d 605, 606 (Va. Ct. App. 2001)).

30

The Court has already decided that Khan had probable cause to believe Carter obstructed justice in his presence. Thus, the arrest would be lawful if an officer could have reasonably believed that one of the statutory exceptions permitting arrest applied.  The Court finds that several exceptions reasonably applied.  First, a reasonable officer could have concluded that Carter would not show up in court for his summons.  Carter failed to respond to a summons Khan issued only months before, which is how his license became suspended. Second, Carter's behavior while handcuffed could lead to the reasonable conclusion that he would pose a danger to officers if released from arrest.  Carter admits that while he was handcuffed he called the officers a "calamity crew" or "keystone cops" (Carter Dep. at 73, 217), told one of the officers "why don't you make me shut up" (*Id.* at 73), and exchanged other "words" with an officer suggesting that there might be a physical conflict if Carter was unhandcuffed.  (*Id.*)  From all these facts within Khan's knowledge that night, an officer could reasonably have concluded that arrest was lawful under § 19.2-74(A)(1).  Therefore, summary judgment will be granted for Khan on Carter's state law claims of false arrest and false imprisonment.

3.          Excessive Force

In addition to Carter's § 1983 claim of excessive use of force, his complaint also alleges a state law claim for excessive force.  (*See* Compl. ¶¶ 32-36.)  In Virginia, "an arrest utilizing excessive force is a battery because that touching is not justified or excused and therefore is unlawful." *Gnadt v. Commonwealth*, 497 S.E.2d 887, 888 (Va. Ct. App. 1998) (citing Roger D. Groot, *Criminal Offenses and Defenses in Virginia* 26 (3d ed. 1994)).  Carter's response memorandum presents no argument in support of his excessive force claim. Without guidance to the contrary, this Court will evaluate Carter's excessive force claim as a claim of battery.

Battery is "an unwarranted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003).  "A plaintiff's assault or battery claim can be defeated by a legal justification for the act, and Virginia law recognizes that police officers are legally justified in using reasonable force to execute their lawful duties." *Ware*, 652 F. Supp. 2d at 712.  "Accordingly, if reasonable force is used by police officers in execution of their lawful duties, they are immune from suit for such acts." *Id.*  The Court concluded above that Khan's actions were objectively reasonable under the Fourth Amendment and that it would not have been clear to a reasonable officer that Khan's

32

taser usage was illegal.  For the same reasons stated above, the Court finds Khan's use of force was reasonable for purposes of this state law claim and thus not a battery.  *See Crihfield v. City of Danville Police Dept.*, No. 4:07cv00010, 2007 WL 3003279, at *3 (W.D. Va. Oct. 11, 2007) ("If the alleged police actions were constitutional or if the officers were entitled to a qualified immunity defense, then these claims would also be dismissed.").

4.     Malicious Prosecution

        To succeed on his malicious prosecution claim, Carter must prove that the prosecution was (1) malicious; (2) instituted by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff.  *O'Connor v. Tice*, 704 S.E.2d 572, 575 (Va. 2011).  Malicious prosecution actions "are not favored in Virginia and the requirements for maintaining such actions are more stringent than those applied to other tort cases."  *Id.*

        The Court has found that probable cause was present in this case with respect to a traffic violation and obstruction of justice.  Thus, Carter's claim of malicious prosecution fails. *See Ware*, 652 F. Supp. 2d at 714 (granting summary judgment on malicious prosecution claim based on finding of probable cause in § 1983 analysis).

33

5.          Intentional Infliction of Emotional Distress

     To recover on a claim of intentional infliction of
emotional distress, Carter must prove "(1) the wrongdoer's
conduct was intentional or reckless; (2) the conduct was
outrageous or intolerable; (3) there was a causal connection
between the wrongdoer's conduct and the resulting emotional
distress; and (4) the resulting emotional distress was severe."
*Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008).
Carter's response brief did not address Khan's arguments that
several of the elements of an intentional infliction of
emotional distress claim are absent here.  The Court agrees with
Khan, Carter's claim of intentional infliction of emotional
distress will be dismissed.

     The element most obviously lacking in Carter's claim
is proof of severe emotional distress.  The emotional distress
required to sustain this claim must be "so severe that no
reasonable person would be expected to endure it."  *Russo v.
White*, 400 S.E.2d 160, 163 (Va. 1991).  The Virginia Supreme
Court has found that a plaintiff failed to satisfy this standard
by alleging she was "nervous, could not sleep, experienced
stress and 'its physical symptoms,' withdrew from activities,
and was unable to concentrate at work."  *Id*. at 28.  In this
case, Carter has failed to allege even emotional distress of the
kind rejected in *Russo*.  Carter's complaint merely states that

34

Khan's actions "caused Mr. Carter severe emotional distress." (Compl. ¶¶ 41-42.)   Carter failed to identify any symptoms or consequences of that distress or demonstrate that he has sought medical treatment.   At this stage of the case, Carter must present more than bare, conclusory assertions.   *See Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) ("A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings . . . .'").   Carter's memorandum in response to this motion for summary judgment provides no elaboration on his alleged distress.   Therefore, Carter's complaint clearly fails to establish the necessary element of severe emotional distress at the summary judgment stage.

Additionally, Carter has not demonstrated that Khan's actions were extreme or outrageous.   Sufficiently outrageous conduct "has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006) (quoting *Russo*, 400 S.E.2d at 162).   "[I]t is insufficient for a defendant to have acted with an intent which is tortious or even criminal." *Russo*, 400 S.E.2d at 162 (quoting Restatement (Second) of Torts commend d. (1965)).   In this case, the Court has found that Khan

35

had probable cause to arrest Carter and exercised a reasonable degree of force.  Therefore, the Court finds no basis to categorize Khan's conduct as beyond all possible bounds of decency or utterly intolerable.  Having concluded that at least two of the elements for an intentional infliction of emotional distress claim are lacking, the Court does not reach the remaining two elements.

In conclusion, viewing the facts in the light most favorable to Carter, the Court finds that Khan did not violate the Fourth Amendment on the night of the arrest.  Additionally, at the time of the arrest there was no clearly established law against using a taser one time to restrain an unsubdued and noncompliant suspect who presented a reasonable threat of force. Finally, none of Carter's state law claims have merit.

### IV.  Conclusion

For the reasons set forth above, the Court will grant Defendant's Motion for Summary Judgment.  An appropriate order will issue.

<table>
<tr><td></td><td>/s/</td></tr>
<tr><td>November 4, 2015</td><td>James C. Cacheris</td></tr>
<tr><td>Alexandria, Virginia</td><td>UNITED STATES DISTRICT COURT JUDGE</td></tr>
</table>